No. 27,778.

Mrs. M. J. Fuller, J. R. Moreland, as Executor of .the Last Will
and Testament of Andrew G. Carlson, Deceased, et al., *Appellees*,
v. Mrs. Alice C. Williams, *Appellant*.

(264 Pac. 77.)

SYLLABUS BY THE COURT.

1. Trial—*Trial by ·Court—Requested Findings of Fact.* When an action is
tried to the court, and the court is requested to make findings of fact as
provided by R. S. 60-2921, and undertakes to find evidentiary facts, it is
error for the court to refuse, on timely request, to make findings of fact on
material matters put in issue by the pleadings and on which evidence was
introduced.

2. Wills—*Duty of Attesting Witnesses.* One who attests and subscribes a will
as a witness does more than witness a signature. He should be at least
reasonably well satisfied of the ·testamentary capacity of the testator and
that he is not under restraint or undue influence.

3. Same—*Contesting Refusal to Probate—Burden of Proof.* In an action to
contest an order of the probate court refusing to admit a will to probate
for the reason, among others, that it was neither executed nor attested in
conformity to law, the burden of proof of due attestation is on plaintiff.

4. Same—*Testamentary Capacity—Adjudication of Insanity as Prima Facie
Evidence.* A lunacy commission adjudged C insane and that his insanity
had existed for thirty days: *Held,* this is *prima facie* evidence of C's in-
sanity during the prior period, and those who contend that he had testa-
mentary capacity within that time have the burden of proof of that fact.

5. Trial—*Reopening Case for Additional Evidence—Discretion of Trial Court.*
A request to reopen a case and to be permitted to introduce additional evi-
dence is one addressed to the sound discretion of the court. In this case
we cannot say that discretion was abused, although as to one of the wit-
nesses offered the request might well have been granted.

6. Same—*Generally.* Some other questions are discussed which may arise on
a retrial.

Appeal from Wabaunsee district court; Oscar Raines, judge *pro tem.* Opin-
ion filed February 11, 1928. Reversed.

J. T. Pringle, of Burlingame, and A. E. Carroll, of Alma, for the appellant.

William Bowes, of Alma, A. O. Justice, of Osage City, A. E. Crane, B. F.
Messick, A. H. Crane, all of Topeka, and J. R. Moreland, of Eskridge, for the
appellees.

'Trial, 38 Cyc. pp. 1939 n. 4, 1970 n. 6, 1974 n. 23, 1989 n. 9; 26 R. C. L. 1042, ·
1089. Wills, 40 Cyc. pp. 1041 n. 66, 1110 n. 53, 1356 n. 54; 35 A. L. R. 79; 28 R.
C. L. 100, 370, 398.

The opinion of the court was delivered by

HARVEY, J.: This is an action authorized by R. S. 22-223 to contest an order of the probate court of Waubaunsee county refusing to admit to probate the will of Andrew G. Carlson, deceased, the probate court having found that the deceased was of unsound mind and not capable of executing or attesting a will as testator at the time of making the alleged will, and was under restraint and undue influence, and that the purported will was neither executed nor attested in conformity to our statute. The plaintiffs in this action are the devisees and legatees and the executor named in the instrument sought to be established as a will; the defendant is the sister and sole heir of the deceased. The pleadings present the issues of the soundness of mind of Andrew G. Carlson, whether he was under restraint or undue influence at the time the purported will was alleged to have been executed, and whether the purported will was executed and attested in the manner provided by law. The case was tried to the court, who, on request of counsel, made findings of fact and conclusions of law. Judgment was rendered for plaintiffs. The defendant has appealed.

Andrew G. Carlson was born in Sweden in 1867. In 1882 he and his sister went with their parents to a farm of 120 acres which their father purchased in Osage county. His sister married in 1895. Andrew never married. He remained at home and worked with his father. In 1897, more land, 160 acres, was bought, in the name of Andrew, and in 1904 an additional 80 acres. Early in 1906 Andrew was treated for mental trouble for some time at a sanitarium at Kansas City. In July, 1906, he was adjudged insane, in the probate court of Osage county, and committed to the state hospital at Osawatomie for treatment, and was discharged as restored in May, 1908. His father died in December, 1906. In March, 1909, on a new complaint, he was again adjudged insane in the probate court of Osage county and committed to the state hospital at Osawatomie, and was discharged as restored in June, 1911. His mother died in August, 1909. In November, 1911, he purchased the interest of his sister in the home place of 120 acres.

Sometime in 1911 he went to Eskridge, where he thereafter made his home. He worked at common labor—sometimes at odd jobs, and was a substitute mail carrier. At times he roomed or boarded where he worked, at times he batched; for three or four years prior to June,

1925, he had roomed, or roomed and boarded, with Mrs. M. J. Fuller. In 1923 he bought a lot in Eskridge; the price paid for this is not shown; it was appraised after his death at $300. While his earnings were not large, he was careful in his expenditures, inclined to be thrifty, and he had the rents from his farms.

In the early part of 1925, before his "business" activities began, he had Liberty bonds of the value of $2,000, a bank time certificate of deposit for $500 a note for $200, and a small sum in a checking account. By June 5 all this money had been spent, he had had an overdraft at the bank, which was very unusual for him, and had given a note to the bank for $400, secured by rent money to be received from his land, and most of this was spent. He had bought two lots, for which he paid $1,200, and on this he built a garage to hold one car, later enlarged to hold several, at a cost of about $1,000. This was appraised after his death at $1,000. He bought another lot for $250, and an interest in a party wall for $552. This was appraised after his death at $150. He stated his intention to build a three-story hotel on this lot, with a grocery store on the third floor, and a restaurant on the first floor where he would feed people all they wanted to eat for 25 cents; that he would draw trade from Topeka, and if people did not patronize him he would stable his horses in it. For this purpose he tried to borrow $10,000 to $13,000 from his banker, and from persons who sometimes made loans, but was unable to get it. He offered $4,000 for a building for which the owner asked $2,500. The owner refused to sell it to him because he thought he was mentally incompetent. He tried to buy a used automobile and offered the price of a new one, but the dealer refused to sell it to him because he thought he was incompetent. Notwithstanding that, he went to the bank and tried to borrow the money with which to purchase it, but was refused.

In hiring men to work for him, and buying some of the materials used, he seemed rather exceptionally shrewd and careful, but his manner was such that some of those who worked for him, and some who sold him material, anticipating that he might be adjudged insane, or have a guardian appointed for him, required payment from him in advance, or at frequent intervals.

Covering the same time of these business activities his personal conduct about town changed radically. Prior to that, although regarded as rather eccentric, there had been nothing especially dis-

turbing in his conduct, but in March, or early in April, 1925, he began to make speeches and to sing on the public streets. Sometimes his talk or song would be in Swedish, sometimes in English. At times he would attempt to preach; at others he was exceedingly profane, and at times his language was vulgar or obscene in the extreme. His voice was loud, he could be heard for some distance, and he frequently attracted attention by conduct of this character. Some of the boys of the village made fun of him, and he threatened them with physical injury; one of them he threatened to kill. At the post office, in the room used by the public, he bemeaned the father of one of the boys and made threats to him.

Many persons complained of his conduct to the mayor, and on April 10 he notified the county officers at Alma, and the county attorney, probate judge and sheriff went to Eskridge, where a number of the leading citizens of the town met at the office of the justice of the peace and discussed Carlson's conduct and what should be done. As a result of this the city marshal, Mr. Zinn, swore to a complaint in lunacy, the probate judge issued a warrant, and Carlson was taken into custody and brought before the probate judge.

The officers thought of conducting a lunacy inquiry at that time, but the only active practicing lawyer in town, J. R. Moreland, was requested by the probate court to appear on behalf of Carlson at the hearing, and he declined to do so. Carlson was brought before the court that evening, but no formal hearing was held because of the inability to have an attorney represent him and because of a lack of five days' notice to him provided by statute. He was interrogated, however, by the probate court and county attorney, and he talked and sang and preached for an hour or more. In these talks he would frequently state what he called "a biography of his life," at which he would state that he was born on Tuesday at one o'clock a. m. July 25, 1870. How he got this day of the week and year 1870 in his mind in connection with his birth is unknown. His birth was recorded in the family Bible, which was in his possession and perhaps had been since the death of his parents, as July 25, 1867, which was Thursday and not Tuesday.

The result of his informal hearing was that the county officials thought perhaps he might quiet down, or prove at least harmless. He was permitted to go at liberty, but the probate judge instructed the sheriff to keep the lunacy warrant and in the event there should

be serious complaint later of his conduct to take him in custody. For a few days thereafter he seemed more quiet. He talked with the mayor, with whom he was on friendly terms, and the mayor told him he ought to be more quiet, which he promised to do. He stated he had been told by his attorney, Mr. Moreland, that he would have to be more quiet or he could not keep him out of the asylum.

He kept up his business activities and soon renewed or continued his objectionable personal conduct. He was very obscene in his talk about women, especially those of the Methodist church. His talks on the street were frequent and disturbing. Some persons would walk out of their way to avoid him. To some he told how he fought the guards when he was in the hospital at Osawatomie and how he had fought other persons by kicking them in the groin.

He was sensitive about his bald head, and, although he talked a great deal about it himself, he took offense when the boys or others spoke of it. He was especially bitter toward the city marshal, Zinn, who had signed the complaint in lunacy against him, and made frequent threats to the mayor and others as to what he would do to Zinn. He went to the residence of a physician, went in the house unannounced or uninvited, and told the wife of the physician how he had "shook like a rat" the father of one of the boys in the town who had taunted him, and so frightened the physician's wife that she had a nervous collapse.

Numerous persons made complaint to the mayor of his conduct and of his threats. Among those who so complained was Mrs. Fuller, one of the plaintiffs in this case, who stated that his conduct was such that she could not remain at home, and she talked about going away; she was afraid to talk to him about it.

About four o'clock the morning of June 5 the city marshal, who was night watchman, when walking along the street, saw Carlson digging with a spade and working near his garage. The marshal spoke to him pleasantly, said something about his being out early. Carlson became very angry, threw down his spade, started toward the marshal, and said, "It is none of your damned business when I go to work." The marshal, not desiring to engage in an encounter with him, walked on. Carlson followed him for nearly a block, cursing and bemeaning him and telling him how he fought people. Later in the day Carlson complained to the mayor about Zinn interfering with him, stated that Zinn had been hired by C. E. Carroll, of Alma, to put him in the asylum, and that Carroll was employed

by his sister—which ideas were pure imagination—and threatened to kill Zinn.

On that morning the mayor notified the county officials of Carlson's conduct, and the sheriff and his deputy went to Eskridge to take him into custody under the lunacy warrant. The sheriff reached Eskridge about noon, or a little before, saw Carlson on the street, and told him he had come to take him to Alma. Carlson said he would like to go to his room. The sheriff and his deputy went with him. Carlson washed and changed his clothes, sang, preached, was profane and used vulgar and obscene language, especially with reference to pictures of nearly nude women which he had on the walls of his room; much of his talk was disconnected, some in Swedish and some in English.

When he got dressed he said he would like to go to see his attorney, Mr. J. R. Moreland. The sheriff and his deputy went with him to Moreland's office. There Moreland asked Carlson if a guardian was appointed for him whom he would like to have for his guardian. Carlson said, "Either you or W. K. Waugh." (Mr. Waugh was in the bank where Carlson kept his account.) Moreland said, "Which would you rather have?" Carlson said, "You." Something was said there about making some kind of a list of Carlson's things, and Carlson said to Moreland that he would like to have him look after his papers. Moreland said, "If you want me to look after your papers, you better get them and bring them here."

Carlson then asked permission to go to the bank and get some papers. The sheriff or his deputy went with him. They went to both the banks, got no papers, went back to his room, where there he dug through his trunk and other effects and got a small tin box, such as papers are frequently kept in, also a small wooden box, a Swedish Bible, which proved to be their old family Bible, and a few other effects, which he took back to Moreland's office.

Soon after returning to the office he indicated to Moreland that he would like to have a private conversation with him. While in this conference Carlson asked Moreland to write his will. Moreland declined to do so, but suggested that he might get the sheriff to write it. Moreland called the sheriff and his deputy in and stated to the sheriff that Carlson had some things he wanted to place, or to write down, and asked the sheriff to write. The sheriff remonstrated and said he didn't have his glasses. Moreland gave his to the sheriff and told him to go ahead and write, and gave him a sheet of paper

off a tablet. The sheriff wrote in pencil on two sheets of the tablet paper. Carlson dictating:

"BARCLAY TWP.

S½ of SW¼ S 18-7-14; E½ of NW¼, NW¼ of NE¼ of in Sex 24-17-13; NE¼ of S 23-17-13 of al the land is give to P. L. Moreland.

In Esk lots 16-17-18 in block 8 an lots No. 3 Main st. in block 8 is willed to Mrs. M. J. Fuller including all the apern there to belongi.

1 Bay 5 y. old pony 11 yr. old.

two whele cart and harness.

All personaly prop is willed to J. R. Moreland.

J. R. Moreland appointed as Exr."

Moreland then told Carlson he should sign that, and he did sign it with his name, "Andrew G. Carlson," and wrote the date "June 5th, 1925." Moreland then told the sheriff to write the word "Witness," and asked the sheriff and his deputy to sign as witnesses, and they both signed. Moreland then asked the sheriff to write at the top of the first page of the paper, "The Last Will and Testament of Andrew Carlson," and the sheriff did. Moreland then stated, "Gentlemen, you know you have written a will." The sheriff said, "If he did, that was the first one he had ever written." Carlson asked what he should do with it. Moreland told him to take it with him and give it to the probate judge, pay him a fee of $1 and he would give him a receipt for it. Moreland got an envelope, put the two sheets of paper in it, sealed the envelope and wrote on the outside of the envelope, "Last Will and Testament of Andrew G. Carlson. In case of death notify J. R. Moreland, Exr." At some time at the office, Moreland, on a piece of scratch paper, took a list of Carlson's things in his house given him by Carlson. This was later checked up and found to be practically correct with the exception he spoke of having two fur coats, which could not be found. Carlson told Moreland to pay Mrs. Fuller five dollars he owed her for room and board. (She later presented a claim against his estate for $249.50, explaining that he had acted so queer, she had said nothing for some time about what he owed.)

Soon thereafter the sheriff and his deputy went to Alma, taking Carlson with them. Carlson gave the envelope containing the writing to the probate judge, paid him $1, and the probate judge issued a receipt, which was sent to Moreland. Notice was given Carlson of the hearing for insanity as the 10th of June. He was kept in jail pending that hearing. While in jail he talked, sometimes pretended

to preach, sang, frequently used profane, vulgar and obscene language; at times he talked so loud that he could be heard in other offices of the courthouse. At times when the sheriff went to the jail he was entirely naked. He asked the sheriff repeatedly to have his picture taken while in that condition; said he wanted to have a number of them made and distributed. He wrote a great deal, both before he was taken to jail and while there. Much of this showed lack of unity of thought.

At the hearing on his sanity, which was before a commission in the probate court June 10, he cursed the physicians on the commission and refused to answer their questions. He was especially bitter toward Zinn, the city marshal, who had signed the lunacy complaint, cursed him and threatened to kill him. He saw A. E. Carroll in the court room, mistook him for his father, C. E. Carroll, and cursed and abused him. When his attention was called to the fact that this was a son, he apologized. He made contemptuous, slurring remarks about the county attorney, Mr. Bowes. He was courteous to the probate judge, whom he said was a friend of his, and answered some questions which he asked him.

The probate judge asked him to make a statement of his property, and he said he would write it. He was given a pencil and paper and wrote the correct description of his farm land, but omitted entirely his property in Eskridge and his personal property. He was asked his age and stated that he was born on Tuesday, at one a. m., July 25, 1870. He asked permission to sing. He sang and talked for more than an hour. The probate judge finally told him that that would be enough, and he quit. His talk and singing were in a loud voice, partly in Swedish and partly in English. His talk was disconnected, with a tendency at times to preach, and at other times he was profane.

He was found to be insane; that his disease was of thirty days' duration; that the cause was supposed to be onanism; that the disease is paranoia; that the disease was increasing, was variable; that he had permanent delusions of being persecuted, and that he showed a disposition to injure others. He was committed to the state hospital at Topeka. W. K. Waugh was appointed guardian of his estate. J. R. Moreland complained to the probate judge that he was not appointed. Carlson died at the hospital January 17, 1926.

The above is intended only as a brief statement of some of the ma-

terial facts taken in part from the abstract of the record and in part from the findings of the court, but is not intended to be full and complete, since it is not practicable to attempt to state all of the matters shown by the record.

Turning now to the legal questions presented in this appeal. Some of the findings made by the court were of ultimate facts, but many of them were of evidentiary facts, from which the court's conclusion of soundness of mind sufficient to make the will was derived. The court undertook to state the principal facts indicating soundness of mind, also some of the facts tending to indicate mental incapacity, but a number of requests for further findings of evidentiary facts indicating unsoundness of mind or insanity of maniacal character, some of which were undisputed, and all or most of them apparently clearly sustained by the evidence, were refused. Appellant complains of the refusal of the court to make such additional findings of fact. The point is well taken and requires a reversal of the case. In *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125, it was held:

"In a suit tried by the court involving the validity of certain conveyances and a will executed thereafter and the mental capacity of the grantor and testator, it was error for the court to refuse, upon timely request, to make findings of fact covering the material issuable matters put in issue by the pleadings and on which evidence was introduced."

In the opinion the duty of the court under R. S. 60-2921, in cases tried to the court, to make findings of fact when requested to do so is fully discussed and the earlier cases reviewed. In *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849, the specific question here presented was before the court except that in that case the lower court had found against the will. In the opinion discussing that question it was said:

"In making findings of fact the court stated evidentiary facts from which its ultimate conclusion of testamentary incapacity was derived. It undertook to state all the principal facts indicating unsoundness of mind, including some which served merely to combat the inference of mental capacity. Facts warranting the inference of mental capacity were likewise found, but twenty or more requests for further findings, out of a much longer list, based upon evidence indicating soundness of mind, some of which was undisputed and all of which was clear and highly probative, were denied. The result is the judgment can not be affirmed, because of the rule established by the decision in the case of *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125." (p. 37.)

This principle of law was again invoked in *Higbee v. Bloom,* 108 Kan. 723, 729, 196 Pac. 1080; *Mortgage Co. v. Randall,* 113 Kan. 62,

213 Pac. 668; *Bank v. Commission Co.,* 113 Kan. 545, 215 Pac. 828; and *McLain v. Barr,* post p. 286, this day decided.

Complaint is made of the rejection of testimony offered. Defendant undertook to show by the sheriff that what he did in writing, what plaintiffs contend now is the will, was done simply to satisfy a whim of Carlson's in order that he might have no trouble in taking him to the county seat; that he then thought and believed that Carlson was insane; that he then had custody of him under an insane warrant; that he believed Carlson might become obstreperous if crossed, and that he had no idea when he was writing the instrument or when he signed his name as a witness that he was in fact writing a will, and that he would not have written it, and would not have signed his name as a witness thereto if he had had any idea there was an effort there made to make a will; that he felt highly imposed upon to think that anyone would contend that what he was there doing was the making of a will. The testimony of the deputy sheriff was to the same effect. This testimony was excluded by the trial court for the reason that it was the mental condition of the testator that was being inquired into, and that what the scrivener or witnesses thought about the matter was of no consequence. It was offered by affidavits on the motion for a new trial. The trial court evidently overlooked the fact that the due execution and attestation of the will under the law was an issue in the case. Our statute with reference to the execution of a will (R. S. 22-202) omits many of the requirements known to the older law. It is not essential to the due execution of a will under our statute that the witness know the contents of the will; nor is it necessary that witnesses sign in the presence of each other; and, generally speaking, a will executed in conformity to our statute is duly executed for the purpose of probate. (*Colman v. Lindley,* 115 Kan. 802, 224 Pac. 912.)

But witnessing a will is a matter of great importance and solemnity. (*Rice v. Monroe,* 108 Kan. 526, 527, 196 Pac. 756.) One who attests and subscribes a will as a witness should do so with the understanding that he is competent to testify on the probate of the will that the testator had mental capacity to make a will and was not under restraint or undue influence. (*Lawrie v. Lawrie,* 39 Kan. 480, 18 Pac. 499; *Hospital Co. v. Hale,* 69 Kan. 616, 619, 77 Pac. 537; *McConnell v. Keir,* 76 Kan. 527, 531, 92 Pac. 540.) The attesting witnesses to a will must not only witness the signing or publishing

of it by the testator, but it is also their duty to satisfy themselves that the testator is of sound and disposing mind and memory and capable of executing a will. (*Smith et al. v. Young et al.*, 134 Miss. 738; *In re Swan's Estate*, 51 Utah, 410.) "A witness to a will must . . . satisfy himself . . . of his (the testator's) testamentary capacity." (40 Cyc. 1110; *Dunkeson v. Williams*, 242 S. W. 653 [Mo.]; Schouler on Wills, 6th ed., §§ 229, 514; Page on Wills, 2d ed., § 332; and see cases collected in annotation 35 A. L. R. 79.) This duty necessarily requires that the attesting witnesses to a will should know and understand that the instrument they are signing as witnesses is a will, and they should do so prepared to testify to the testamentary capacity of the testator, and that he is free from restraint and undue influence.

We are aware there is a line of authorities to the effect that a witness to a will need not know whether he is witnessing a will or some other instrument, but we do not regard such authorities as being in accord with the duties required by an attesting and subscribing witness to a will under our statute, in accordance with the decision of our court. It was error, therefore, for the court to exclude this evidence. It is true the court made a finding of fact that the attesting witnesses "before its completion knew it purported to be the last will and testament of Andrew G. Carlson." But this finding necessarily falls, because the court excluded material, competent evidence of the witnesses on that question. Appellees point out that the word "willed" was used in the writing done by the sheriff, and also that an executor is named, as justifying the court in reaching this conclusion. But this, of course, does not necessarily follow. If the sheriff was simply attempting to appease Carlson by complying with some wish of his in order to avoid trouble with him, and if he really regarded Carlson as then insane, or under restraint or undue influence, what he did in signing the paper as a witness would not amount to an attesting and subscribing to a will as a witness to it. It must be remembered that the probate court refused to admit this instrument to probate as a will, for the reason, among others, that it was neither executed nor attested in conformity to our statute. There is, therefore, no presumption of due execution and attestation as provided in R. S. 22-224, and the burden in this case is on plaintiffs to show due attestation by the subscribing witnesses.

While not specifically referred to by counsel, there is one matter

which stands out rather clearly from the record and which should be mentioned. Obviously the case was tried on the theory that every person is presumed to be sane until he is tried and adjudged to be insane, and hence that the burden of showing insanity, the type of insanity, and how it affected Carlson with respect to the disposition of his property, was on the defendant. In this case consideration of the matter should have been approached from directly the opposite theory. When Carlson was adjudged insane on June 10, the commission which adjudged him insane also found the time previous to that when insanity had existed. They found it existed for thirty days. In *Witt v. Heyen,* 114 Kan. 869, 221 Pac. 262, we had occasion to consider the effect with respect to such a finding prior to the date of the hearing. It was there held that under a statute requiring the jury or commission to find the duration of the disease prior to the inquest, where a finding of insanity was made and that the disease had existed from a prior date, the finding is conclusive evidence of insanity at the date of the inquest and *prima facie* evidence of insanity during the prior period overreached by the findings. Applying the rule there stated to the case before us, the adjudication of insanity of Carlson on June 10 was conclusive evidence of his insanity on that date, and the finding by the commission that the condition had existed for thirty days was *prima facie* evidence of his insanity for a prior period of thirty days. Since June 5, the date of the purported will, was within that time, an inquiry into Carlson's mental condition should start with a presumption of insanity at that time, and the burden is on plaintiffs, who assert his sanity, to rebut that presumption.

After the evidence in the case was taken and both parties had announced the evidence was closed, the case was taken under advisement and tentative findings of fact submitted to counsel. Defendant moved for a modification of the findings of fact, to strike out some of them, and for the making of additional findings of fact, which request was by the court refused. At the same time she asked that the case be reopened for the introduction of additional evidence. Defendant's request was that she be permitted to further examine some of defendant's witnesses and to further cross-examine some of the witnesses for plaintiffs. The court refused this request, and very properly so. The defendant asked leave to introduce additional witnesses and had affidavits from those witnesses as to what their testimony would be. This was overruled for the reason

that the testimony was largely cumulative and that no diligence had been shown to present it at the trial. This ruling is complained of. It is a matter that was largely within the discretion of the trial court, and there is nothing in the ruling that approaches an abuse of that discretion unless it can be said to be in connection with the offered testimony of Doctor Perry. Even as to that we are reluctant to say that the court's ruling was an abuse of discretion, for the defendant might well have anticipated, or have known beforehand, the nature and importance of the testimony of Doctor Perry and had him present at the trial. On the other hand, it would have been conducive to the due administration of justice to have received his testimony. He was the only real expert witness on the question of the insanity of Carlson. Carlson was directly under his care and treatment from the time he entered the hospital, about June 13, until his death in the following January. The witness' knowledge of the nature of Carlson's insanity, the manner in which it would naturally evidence itself, the necessary effect of it upon his mental faculties, would have been valuable to the court in this case. This testimony was not cumulative. The testimony of Doctor Perry, as disclosed by his affidavit, tends to show that the business activities of Carlson for the two or three months before he was adjudged insane, relied upon by plaintiffs and found by the court as evidence of his soundness of mind in business matters, were in fact evidences of the hyperactivity of the mania with which he was afflicted, and that these, together with his personal conduct, demonstrated an unsoundness of mind which incapacitated him from comprehending transactions requiring thought and consideration, or rationally or understandingly completing them. But since the case must be tried again, the error, if any, in refusing to receive the testimony of Doctor Perry becomes unimportant; it can be produced on the retrial.

Appellant specifically complains of the court's finding that Carlson was subject to monomania on the subject of women, was eccentric and erratic on the subject of religion, but that his mind was not otherwise affected. It is difficult to find the evidence in the record to sustain this finding. His delusions about his being persecuted, his exhibitions of anger and threats to do bodily injury and to kill, and his abnormal, flighty business activities were not associated directly either with women or religion. The finding of the lunacy commission was that his disease was paranoia. The summary of his mental condition as shown by the records of the state

hospital is that he "had two previous attacks of insanity; first in 1906, and again in 1909, duration of each attack two years. . . . This attack is said to be of 30 days' duration and is shown by religious delusions, ideas of persecution, flighty ideas, euphorism, motor-excitement, pressure of activity and busyness." The final diagnosis was "manic depressive insanity, manic type." See Wharton & Stille's Medical Jurisprudence, 5th ed., § 619 et seq.; Glueck's Mental Disorder and the Criminal Law, pp. 358, 359, 370, 432; Singer and Krohn, Insanity and Law, p. 328, for discussion of insanity of this character upon the subject of mental capacity to comprehend transactions requiring thought and consideration and rationally to complete them.

Appellant contends that the evidence disclosed that Carlson had an insane delusion that his sister desired to get him in the asylum, or to keep him there, in order that she might get his property, and that this delusion is reflected in the instrument sought to be established as his will. The court made an ultimate finding that Carlson had no such delusion, and made evidentiary findings of fact tending to support such ultimate finding, but refused, although requested to do so, to make evidentiary findings of fact tending to establish the existence of such a delusion, and the further fact that his friends had tried to talk him out of his delusion in that particular, but without success. Since the court was making evidentiary findings it was error not to make findings on this question. See authorities above cited. We shall not prolong this opinion by a statement of the evidence bearing on this question, but since the case is to be tried again, simply mention it as a question that should receive due consideration. The rules of law pertaining to such insane delusions are sufficiently discussed in former decisions of this court (Medill v. Snyder, 61 Kan. 15, 58 Pac. 962; Akins v. Akins, 109 Kan. 453, 199 Pac. 922), and other authorities readily accessible. It is familiar law that one laboring under an insane delusion which influences him to make a will in a certain way does not possess testamentary capacity. (Harbison v. Beets, 84 Kan. 11, 18, 113 Pac. 423.) In this connection it will be noted that the commission which adjudged him insane found that he had permanent delusions of being persecuted. Possibly he had these delusions also with reference to Zinn and to C. E. Carroll, but as to these persons, of course, the delusions were not reflected in the writing sought to be established as his will.

On a retrial there should be more specific findings of fact as they relate to that portion of R. S. 22-214 which reads:

"That in all actions to contest a will, if it shall appear that such will was written or prepared by the sole or principal beneficiary in such will, who, at the time of writing or preparing the same, was the confidential agent or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall be affirmatively shown that the testator had read or knew the contents of such will, and had independent advice with reference thereto."

The court did find that Carlson had no independent advice with reference to making a will; that J. R. Moreland was his legal adviser; and that he directed the preparation of the instrument in question. J. R. Moreland was one of the beneficiaries named therein, also his son and business associate, P. L. Moreland. But the value of the estate, or of the portion attempted to be given to each of the beneficiaries, is not found. It is not argued here whether the attempted gift to the son should, for the purpose of applying the above quoted statute, be regarded the same as though it had been made to J. R. Moreland, hence we express no view on this question at this time.

Other matters are discussed, but we do not regard them as requiring special attention.

After the evidence had been heard and the court had made its tentative findings, defendant moved to disqualify the trial judge because of his business relations with some of the attorneys for plaintiffs. This motion was overruled, and appellant complains of that ruling. There is no merit in this complaint. We have carefully examined the record and find no reason to suspect that the trial judge was biased or prejudiced either in favor of or against any of the parties to this action or their counsel.

For the reasons stated in the opinion the judgment of the court below is reversed, with directions to grant a new trial.

MARSHALL and HUTCHISON, JJ., dissenting.

DAWSON, J. (concurring in part): I agree to the reversal of the judgment, but think this litigation should be terminated and judgment ordered on the ground that a madman on his way to the lunatic asylum for the third time lacks capacity to make a will.