No. 36,749

In the Matter of the Estate of Joseph C. Koellen, Deceased. (ANTHONY H. LAMPE and BLANCHE A. LAMPE, *Appellants*, v. JOHN H. WILLE et al., *Appellees*.)

(176 P. 2d 544)

Opinion filed January 25, 1947.

Owen Samuel, of Emporia, and Guy Lamer, of Iola, argued the cause and were on the briefs for the appellants.

W. D. Jochems, of Wichita, argued the cause, and J. Wirth Sargent, Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, all of Wichita, E. E. Lamb and Clyde Hill, both of Yates Center, were with him on the briefs for the appellees.

The opinion of the court was delivered by

WEDELL, J.: This is a will case.

Two instruments, one executed in 1941, the other in 1943, are involved. Anthony H. Lampe and Blanche A. Lampe, his wife, appellants, are two of the beneficiaries named in the last instrument. That instrument is appended hereto and made a part hereof. Appellants are named as executors thereof. John H. Wille, the executor named in the first instrument, presented that will for probate. The two instruments were considered for probate at the same time in the probate court of Woodson county. The first instrument, conceded to be a will, was admitted to probate while probate was denied to the latter instrument. On appeal to the district court appellants were likewise unsuccessful and have appealed to this court. In the district court, in response to a motion of appellees, which was sustained, appellants were required to separately state and number what

appellees and the trial court regarded as separate causes of action. The first cause of action was predicated on the theory the last instrument constituted a will and revoked the former will. In the second cause of action it was, among other things, in substance, alleged that if it be determined the last instrument did not constitute the last will and testament of decedent it constituted a contract between him and appellants whereby the latter become owners of the particular property therein set off to them. The trial court sustained a demurrer to the second cause of action. Appellants are not particularly complaining of that ruling. They insist the last executed instrument is a will and that all pertinent questions are involved in their first cause of action.

The witnesses to the instrument testified and other oral testimony was adduced by the parties. The trial court made findings of fact and conclusions of law. Appellants' motion for a new trial and a motion to strike portions of the findings made and to make additional findings of fact were overruled.

A few preliminary and undisputed facts may be stated before we turn to an examination of the instrument involved. The decedent was about sixty-five years of age at the time he died. He had been suffering with organic heart trouble for a number of years. His condition fluctuated. He lived alone. Neighbors, including appellants, had been kind to him over a period of years prior to his last illness and had helped him in various ways. On January 1, 1943, he came to the home of appellants and continued to live with them until March 1 when he reluctantly went to the hospital at the direction of Doctor Christian, who had treated him on occasions for several years prior to 1943. Doctor Christian had made two or three calls on decedent at appellants' home before he sent him to the hospital. The doctor wanted decedent to be in the hospital where he might be nearer to him and because he believed decedent could obtain better care and attention there. The instrument in question was executed January 28, 1943. The trial court did not find decedent lacked testamentary capacity and there is no contention he was not in complete possession of his mental faculties prior to and on that date. Decedent entered the hospital March 1, 1943, and died on the tenth of March.

The trial court found that while the instrument in question was testamentary in character it was not decedent's last will and testament but was really a bilateral contract. The parties agree the first

question presented is whether the instrument is a will. The instrument bears the label "Agreement," uses that term in its first sentence and refers to decedent as "first party" and to appellants as "second parties." It states what appellants agree to do both before and after decedent's death in consideration of the benefits the instrument provides for them. Decedent and appellants are also designated as parties under the signature lines. An acknowledgment form was attached but was not executed.

On the other hand, the instrument in its first sentence, following the words "This Agreement" also contains the words "and this Will and Testament." The second paragraph emphasizes decedent's age, bad health, the absence of relatives in whom he had an interest, the need of someone to whom he might look for aid, constant attention and assistance during the remainder of his life. It then acknowledges the marked assistance appellants previously had been to him in providing him comfort and material aid in sickness. In consideration of those things and the agreement of appellants to provide for him during the remainder of his life and to assume certain obligations at his death, all as indicated in paragraph three, the instrument states decedent is doing certain things. What are they? He revokes all former wills; he appoints appellants sole executors of "his last Will and Testament;" he directs they shall serve without bond; he gives, devises, wills, bequeaths, grants, transfers and sets over to appellants any and all of the property which he shall own or of which he shall be seized, both personal and real, *at the time of his decease*, except the property otherwise disposed of in the instrument. He further agrees that upon the performance of the duties and obligations which appellants assume all the property which decedent owned is to become the absolute property of appellants *upon decedent's death.*

In the concluding paragraph decedent agrees that out of the personal property owned at his death specified amounts shall be paid to other designated beneficiaries and finally that all personal and real property, except the last mentioned items, shall become the sole property of appellants *at the time of his death and after appellants have performed the conditions enumerated.*

The last sentence refers to the instrument not only as "This Contract" but also as "this Will and Testament." Instead of executing the attached acknowledgment two persons signed their names under the word "Witnesses."

If the instrument is a will it would not have been invalidated had it been notarized. (*Derr v. Derr*, 123 Kan. 681, 686, 256 Pac. 800.)

The character of an instrument is not determined by a characterization or label the parties may place upon it. Its real character and legal effect are determined by its terms, provisions and intent. (*Reed, Ex'r, v. Hazleton*, 37 Kan. 321, 15 Pac. 177.) What the instrument intended to accomplish must be gathered from its four corners and not by single words, isolated phrases or even sentences. Facts and circumstances surrounding its execution become competent only in the event the instrument is ambiguous on its face and requires aid to clarify its intent. (*Shannep v. Strong*, 160 Kan. 206, 211, 160 P. 2d 683.) So an instrument denominated a "contract" has been held to be testamentary in character. (*Imthurn v. Martin*, 150 Kan. 906, 96 P. 2d 860.) Likewise an instrument labeled "warranty deed" has been declared to be testamentary in character. (*Lowry v. Lowry*, 160 Kan. 11, 159 P. 2d 411.) In fact the term "will," as used in our statute, includes every kind of testamentary act taking effect from the mind of the testator and manifested by an instrument in writing, executed and attested in conformity with the statute. (*Derr v. Derr*, supra, syl. ¶ 3.) The fact an instrument is contractual in character does not destroy its validity as a will if its terms disclose it was intended the title to the property involved should not pass from decedent presently but should vest in the beneficiaries named only after the decedent's death. (*Imthurn v. Martin, Lowry v. Lowry*, both supra, and cases therein cited.)

As previously indicated this instrument employed some language appropriate to contracts and other language appropriate only to wills. The vesting of title in appellants was definitely deferred not only until after Koellen's death but also until appellants had performed conditions imposed upon them by the contract. The instrument speaks for itself. It starts with the words "This Agreement, and this Will and Testament." It ends in the same manner. The provisions in the body of the instrument disclose on their face it was a contractual will and clearly was intended to be just that. Where the intent reasonably can be ascertained it will be declared and executed unless it be contrary to law or public policy. (*Shannep v. Strong*, supra, p. 211.) A contractual will is neither contrary to law nor public policy.

The mere fact, however, an instrument is testamentary in character does not mean it is a valid will and entitled to probate. In

order to operate as a will it must be executed in the manner provided by statute. (*Imthurn v. Martin; Lowry v. Lowry,* both supra.)

Both witnesses to the will were farmers. The testimony of the witness, Paul Guatney, in substance, was:

They came to appellants' home, where decedent resided, at the request of one of the appellants; he had known decedent seven or eight years; decedent had the instrument in his pocket; he took it out of his pocket and said, "I would like for you boys to witness an agreement between myself and Lampes;" decedent handed the instrument to the witness to look at, to read; they read it over; they were with him about fifteen or twenty minutes; he observed nothing wrong with decedent's mental condition; decedent seemed to be able to discuss the instrument intelligently with them; he handed it to them and they read it over; that is about all he remembered being said; he and Mr. Beatty signed the instrument as witnesses after decedent had signed it.

The witness', George Beatty, testimony was much the same as that of the witness Guatney except when asked to state what decedent said to them when he requested them to sign as witnesses. The witness said: "O, he (meaning the deceased) just *says* asked us boys if we would mind signing a will or contract, I forget which he called it." On cross-examination the witness stated he did not know whether decedent called it a will, a contract or either one. When confronted with his testimony at the probate hearing he admitted his testimony there was that decedent said he wanted him to witness a paper or contract or agreement with Tony (Lampe) and his wife.

Doctor Christian testified decedent was able to discuss matters intelligently on the date the instrument in question was executed but that he did not discuss business matters with him.

In view of what previously has been said we need not dwell upon the precise name by which reference may have been made to the instrument when it was executed. Decedent was of sound mind. He had the instrument in his possession and took it from his pocket. He asked two persons to witness his signature thereto. He handed it to them to read. They were with him fifteen or twenty minutes. They read it over. Whether they read it audibly does not appear. They saw him sign it. When he did so the witnesses subscribed their signatures thereto. G. S. 1945 Supp. 59-606 provides:

"Every will, except an oral will as provided in section 44 [59-608], shall be in writing, and signed at the end thereof by the party making the same, or by

some other person in his presence and by his express direction, and shall be attested and subscribed in the presence of such party by two or more competent witnesses, who saw the testator subscribe or heard him acknowledge the same."

Did the testimony of the witnesses satisfy requirements of the statute? We think it did. It will be observed our statute does not require publication. Publication is the act of making it known in the presence of the witnesses that the instrument to be executed is the last will and testament of the testator. (1 Page on Wills, Lifetime ed., § 376.) Our statute does not require the instrument to be read to the witnesses by the testator. It does not require the witnesses to actually know it is a will. And this is the rule under the great weight of authority where the statute does not expressly require publication.

In ruling this instrument was not entitled to probate the trial court made findings that the facts, which we have just stated our statute does not require, had not been shown. The findings were attacked by motion to strike. The motion was overruled. Appellees contend appellants were obliged to show the witnesses knew and understood the instrument they subscribed was a will and in support cite *Fuller v. Williams,* 125 Kan. 154, 264 Pac. 77. While such a statement is found in the course of that opinion it is not contained as a statement of law in the syllabus. Our careful reconsideration of the precise point convinces us such a statement in that or in any of our other cases is too broad.

An excellent statement on the subject is found in 1 Page on Wills, 2d ed., § 360. While it is somewhat long we think it merits quotation. It reads:

"If the Wills Act does not provide for publication in express terms, and merely provides that the attesting witnesses shall sign the will, it is held, by the great weight of authority, that publication is not necessary; and that the witnesses need not be informed that the instrument which they are attesting and signing is a will. Where, under such a statute, the testator showed witnesses a paper with his signature and asked them to attest it, it was held to be a sufficient acknowledgment of the signature and a valid attestation; even if testator deceives the witnesses as to the nature of the instrument which they are signing, as by representing that it is a business document. This result is justified on the theory that the legislature has made full and ample provisions for the formalities which are necessary to a valid will; and that the courts have no power to add to such requirements.

"In some jurisdictions, however, it has been held that the attesting witnesses must be informed that the instrument is a will, even though the statute does not, in terms, require publication. This result has been justified on the

theory that the word 'attestation' implies that the subscribing witnesses must know the nature of the instrument which they attest. This meaning of the word 'attest' is not, however, the one usually accepted. It is probable that, in some of these cases, the court, when it says that the witnesses must understand the nature of the instrument, means only that they must know that it is some sort of a legal document which they are asked to attest. In some of the other states, where it had once been said that publication was necessary, although not required, in terms by statute, such an explanation has been adopted in later cases. In Vermont, the courts have used language which seemed to imply that publication was necessary; but when the question was presented for decision subsequently, the court said that the earlier cases did not require that the witnesses should know that the instrument was a will, but only that it was an instrument which testator wished to execute, and that they attested his execution by adding their signatures. In some cases in which it is suggested that the witnesses should know the nature of the instrument, the point was not presented squarely for decision." (p. 576.)

In section 361 of the same text it is said:

"It is not necessary that the witnesses should know the contents of the will, whether the statute requires publication, or whether the necessity of publication is inferred although not required in express terms, or whether publication is not necessary. Still less is it necessary that the will should be read to the witnesses."

See, also, 1 Page on Wills, Lifetime ed., § 379.

The trial court further found the evidence did not show by whom the instrument was written, that decedent intended to make a will or that he knew what the instrument contained. We know of no statute or decision of this court which requires proof of who the scrivener was as a condition precedent to probate. Touching the other findings just mentioned it is sufficient to say decedent had the will in his own pocket. He desired to sign it and he requested two persons to witness his signature. While it is, of course, indispensable to the validity of a will that a testator should know its contents at the time of execution, knowledge will ordinarily be presumed from the execution of the instrument. The presumption is only a prima facie one and may be rebutted. (68 C. J. § 226, p. 606.) In the instant case the presumption prevails as there was no affirmative evidence the testator did not know what it contained.

The trial court also found that during the later years of his life decedent had failing eyesight and during the latter months of his life he was unable to read. That is not proof the instrument was not read to or fully explained to decedent before he executed it. The same would be true in the case of a testator who had perfect eyesight but was unable to read. It would be true where a testator had

directed the scrivener how he wanted his property disposed of by will and the scrivener prepared it exactly as directed and so advised the testator. The testator may not have read the will in any of these instances. Morover, he might not have understood the legal significance of the language employed if he had read it.

The trial court, in substance, further found that a day or two before decedent's death and while in the hospital decedent told Father Gorges he had only one signed will, which could be found in the second drawer of his desk at his residence, and that O. W. Lair found the will, as indicated, in the presence of Father Gorges and William Westerman. This was the first will executed in 1941 which the later contractural will revoked. The testimony relative to what decedent told Father Gorges was objected to on the ground Father Gorges was an incompetent witness to testify concerning a conversation between himself and decedent, his parishioner. The statement was no part of a confession made to the priest in his professional character in the course of discipline enjoined by the church to which decedent belonged. The priest, therefore, was not an incompetent witness under our privileged-communication statute. (G. S. 1935, 60-2805.) See, also, 70 C. J., § 615, p. 451. But manifestly such oral testimony could not nullify the existing contractural will under the express contrary provisions of our law. G. S. 1945 Supp. 59-611 provides:

"Except as provided in section 46 [59-610], no will in writing shall be revoked or altered otherwise than by some other will in writing; or by some other writing of the testator declaring such revocation or alteration and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself or by another person in his presence by his direction."

See, also, what provision a written revocation would need to contain in order to revive the first will upon which appellees rely. (G. S. 1945 Supp. 59-612.)

Appellees argue decedent and appellants occupied a confidential relationship and that the inference from the testimony is, appellants, or one of them, was the scrivener of this instrument. Appellees point out there was no evidence decedent had independent advice. Upon the alleged inference as to who the scrivener was, appellees argue the instrument, if a will, was invalid as to the appellant beneficiaries because the statute requires decedent should have had independent advice. (G. S. 1945 Supp. 59-605.) The contention can-

not be sustained. It is sufficient to say the trial court made no finding that the evidence supported any inference with respect to who the scrivener may have been. A careful examination of the record compels us to conclude no inference with respect to who the scrivener may have been was properly deducible from the evidence.

Appellees contend this court should affirm the challenged findings of the trial court that appellants failed to perform the conditions imposed upon them by the instrument. These findings were:

"3. . . . The said Koellen had an aversion relative to going to the hospital . . . there is nothing in the evidence to·show that they [appellants] ever went to the hospital to see or visit him, comfort him, shave him,· or in any other manner to aid or assist him or to provide for his comfort during his final days.

. . . . . . . . . . . . ·. · [•]

"7. That neither Anthony H. Lampe, nor Blanche A. Lampe have paid the funeral expenses nor the doctor bill of Doctor Christian, who was the attending physician for Mr. Koellen; that the Lampes had knowledge of the said funeral expenses and doctor bill and that they had a reasonable time in which to pay the same, but they have failed to do so."

It is true decedent had been in the hospital previously and did not like it. His specific complaint, as disclosed by the evidence, was that he was overcharged. But whatever the exact reason may have been we need not labór that point. Assuming he personally preferred to remain in the home of ·appellants such a preference would tend to indicate he was·not dissatisfied with the treatment he was receiving at their hands. But we may also pass that point. The fact remains the only reason, disclosed by the record, for his return to the hospital is that he did so solely on the direction of his own physician.

What did appellants fail to do for decedent during the ten days he was under the supervision and care of the hospital authorities that would justify striking down the contractual will? What could or should they have done in view of his condition that would justify nullifying the will? Decedent's own doctor testified concering his condition just prior to and while he was in the hospital as follows:

". . . he observed the deceased in the Lampe home, discussed matters and the deceased was able to discuss matters intelligently with him up until about February 23, 1943 . . . after he went to the hospital, he didn't have very much to say . . . right away, about the time they took him into the hospital, he went kind of off, out of his head, and from then on, he wouldn't talk to you at all. He wasn't really conscious out there (St. John's hospital). I think he had a cerebral *hemorhage* of some kind out there."

Moreover, there was ·no indication whatsoever that every rea-

sonable need, aid and comfort was not generously provided by the doctor and the hospital attendants.

The funeral expenses were $495.25. The unpaid balance of Doctor Christian's bill was $21. The amount of the hospital bill is not disclosed and it would appear it was paid by appellants but we shall not assume that fact. John H. Wille was appointed executor under the 1941 will. Appellants were named sole executors in the 1943 will. The testator died March 10, 1943. On the day following his funeral Wille's son learned appellants claimed part of decedent's property. Thereafter events moved rapidly. A special administrator was appointed immediately and on April 8, appellees filed a petition for the probate of the first will. Within less than one month thereafter appellants filed a petition for the probate of the contractual will. Before a hearing was had on these petitions and before it could be determined which of the wills would be admitted to probate or which of the executors named in the respective wills would be authorized to administer the estate, the funeral bill was paid by the special administrator. A claim for that bill was filed on May 5 and was paid by the special administrator on July 23, 1943.

It was therefore obvious from court records, if not otherwise, as early as April 8, and within less than one month after testator's death, that only litigation could determine what rights appellants had in and to decedent's property, if any. Were appellants, under these circumstances, obliged to rush in and pay these claims against decedent's estate before the special administrator paid them? Did their failure to do so deprive them of their rights under the contractual will? We do not think so. Of course, the property being devised to them was burdened with the obligations specified in the will and appellants will be required to meet them before the property vests in them. The will so provides.

The judgment is reversed with directions to enter judgment in favor of appellants in accordance with the views herein expressed.

### "AGREEMENT

"This Agreement, and this Will and Testament, this day made between Joe C. Koellen, of Piqua, Kansas, and Blanche A. Lampe, and Anthony H. Lampe, also of Piqua, Kansas, hereinafter referred to as first and second parties respectively,

"WITNESSETH:

"First party having arrived at an advanced age, and being in bad health, having no relatives or anyone who he can depend for help and assistance, and

in need of someone on and to whom he can look for care, aid and assistance during the remainder of his life, and being in such a condition of health that he is in need of constant aid and attention, hereby agrees with second parties who heretofore and for a great many years prior to this time have been of marked assistance to first party in providing him comfort and material aid in time of sickness.

"First party revokes all former wills, and appoints second parties sole executors of his last Will and Testament, and to serve without bond, and now gives, devices, will, bequeaths, grants, transfers, and sets over to second parties any and all the property which first party shall own or be seized of, both personal and real, at the time of first party's decease; said property and all of it with the exception of the exceptions hereinafter contained and recited to the said second parties, for the following consideration, covenants and things to be done by said second parties, Second parties in consideration of the above covenants and deeds and the things done and performed by the party of the first part, same being the giving, devising, willing, bequeathing, granting, transferring, and setting over of all property, real and personal, to them, agree to provide a home for the party of the first part, and care for, maintain and look out for him during the balance of his natural life time, and on any and all occasions, to do everything within their power to provide for his present and future comfort through health and sickness, and to see that he is provided not only a proper home and comfort, maintenance and help during his life time, but at his decease providing proper burial and interment, and further, to provide all the expenses *incited* to the above services for and in behalf of the party of the first party, and upon the decease of first party, all of the property which first party owned is to go and become the absolute property of second parties.

"It is further agreed mutually and by all parties signatory hereto that out of the personal property which first party and decedent shall own at the time of his decease, shall be paid the sum of Five Hundred ($500.00) Dollars to St. Martin's Church of Piqua, Kansas, and an additional sum of Two Hundred ($200.00) Dollars to William Massoth, and an additional sum of One Hundred ($100.00) Dollars to Emma Sicka, all of Piqua, Kansas, said Church having been through the decedent's and first party's life, the church in which decedent was a parishioner, and the two others last mentioned parties having been helpful and friendly and having performed many kindnesses to said decedent, and with the exception of said above-excepted items, all of the personal and real property is to become the sole property of second parties, herein at the time of his decease, and after second parties performing of the conditions herein enumerated.

"This Contract, this Will and Testament, made and executed by parties signatory here on the 28 day of January, 1943.

> "Joe C. Koellen, *First party.*
> "Blanche A. Lampe,
> "Anthony H. Lampe, *Second parties.*

"Witnesses

GEORGE BEATTY

PAUL GUATNEY

"State of Kansas

"County of............................................................

"Be it remembered, on this....................day of............................................. 194........ personally appeared before me, the undersigned notary public in and for the above named County and State, Joe C. Koellen, to me personally known to be the party who executed the within and foregoing instrument and duly acknowledged the execution of the same.

"In Witness Whereof, I have hereunto affixed my notary seal on the day and year last above mentioned.

............................................................................................
                                                             Notary Public.

My commission expires"