No. 28,328.

THE STATE OF KANSAS, *Appellee,* v. CLYDE EDWARD PAINE, *Appellant.*

(271 Pac. 308.)

Opinion filed November 3, 1928.

*J. H. Brady, C. O. Gorsuch* and *Blake Williamson,* all of Kansas City, for the appellant.

*William A. Smith,* attorney-general, *Roland Boynton,* assistant attorney-general, *Arthur J. Mellott,* county attorney, and *H. J. Emerson,* deputy county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of murder in the first degree, and appeals. His principal contention is that the court erred in admitting testimony that he was sane, given by nonexpert witnesses.

On August 24, 1922, Paine shot and killed his neighbor, Jack Heath. Heath lived at 1213 Park avenue, Kansas City, Kan. W. B. McFarland and his wife lived at the next number on the east. The McFarlands had an adopted daughter Helen, and McFarland's step-daughter, Mrs. LeGuette, lived at his home. Paine and his family lived directly across the street. Mrs. LeGuette was a stenographer in an office in Kansas City, Mo. On the afternoon of the killing, her mother, Mrs. McFarland, telephoned her that Paine had been saying Helen was Mrs. LeGuette's child. As Mrs. LeGuette was going home in the evening, she saw Paine standing in his yard. She went to him, and told him what her mother had said. He said he knew nothing about it. Mrs. LeGuette said he would have to prove it; and he replied she might start something, but he would finish it.

This conversation occurred about 5:15 p. m. Later, McFarland came home, and after talking with Mrs. LeGuette, went across the street to see Paine. Paine denied making the derogatory statement. McFarland said Jack Heath had told Mrs. McFarland that Paine had circulated the slander. Just then Heath came down the street, and Paine suggested that Heath be asked about it. Heath came across the street, and an angry conversation ensued. Heath said, "Yes, he did tell it. He told my folks." Paine still denied making the statement, and Heath said, "Clyde, no use sitting there and lying about it; you did say it." McFarland then interfered, said this was neighborhood gossip, with not a word of truth in it; they all knew it, and they might as well forget it, shake hands, and be friends. The men then shook hands, and parted. This occurred about 6 or 6:15 p. m. Heath went home, Mrs. Heath prepared dinner, and after dinner Mr. and Mrs. Heath went out on the porch of their home. Mrs. Heath sat in the porch swing. Paine was sitting on the porch steps of his house, reading, or apparently reading a newspaper. Heath talked for a few minutes with some friends who were passing by, and then sat in the swing with his wife. Paine got up, went into his house, reappeared in a short time, and then went directly across the street toward the Heath home, with his right arm behind him. The Heath home stood on a terrace. When Paine reached the ter-race steps, he said to Heath, "Jack, you are going on a long jour-ney," and began shooting. Heath arose, started across the porch, and his wife placed herself between Paine and her husband. Paine stepped to one side, and continued to shoot. Heath tried to get over

the porch bannister, but fell over it, and fell on his knees. While on his knees, Paine shot him. Heath arose, staggered into his backyard, and fell dead. He had been shot five times.

Paine was a car inspector for the Rock Island Railway Company at its Kansas City shops, and joined the strike of July 1, 1922. There was testimony that he was a superior mechanic, a devoted home and family man, and a genial companion. The defense to the action was that Paine was afflicted with syphilis in the ultimate stage of development; the disease affected his nervous system, causing mental instability; turmoil and agitation attending the strike, and sickness in his family, had caused mental derangement, so that he became a changed man, and was insane when he killed Heath.

Paine was arrested on a warrant issued August 28, 1922. On November 9, he waived preliminary examination, and was held for trial in December. On December 4, and before trial, application was made to the court for appointment of a commission to ascertain his mental condition. A commission duly appointed found him to be insane, and on December 27 he was committed to the hospital for the dangerous insane, at Lansing, for treatment and safe-keeping. About two years later he was examined by an institution commission, which reported that he should be held for further treatment. In June, 1926, an institution commission found he was sane. A bench warrant was issued, he was returned to Wyandotte county, and an information for murder in the first degree was filed against him. He was tried, and was convicted, but the court granted a new trial. At the second trial the jury disagreed. In February, 1928, he was tried again, was found guilty, his motion for new trial was denied, and he was sentenced to the penitentiary for life.

At the trial the state proved the homicide and the circumstances under which it was committed. Defendant offered testimony to support the defense of insanity, as outlined above. In rebuttal, the state offered the testimony of two medical expert witnesses and the testimony of seven nonexpert witnesses, to prove sanity. No objection was made to the testimony of five of the lay witnesses. The two physicians expressed opinions, based on a hypothetical question, that Paine was sane when he killed Heath. The abstract discloses no objection to the qualification of either witness. The hypothetical question is not abstracted. It is described in the abstract as follows:

"Doctor Bresette was then asked a lengthy hypothetical question by the

learned county attorney, embracing the same matters involved in other hypothetical questions in this record, detailing the actions of the defendant and the details of the homicide."

The other hypothetical questions in the record are those framed by defendant's counsel. It does not appear that any objection was made to the question propounded to the state's medical experts.

McFarland had known Paine for twenty years, helped build the house Paine lived in, lived directly across the street from him, and they were friends. McFarland saw Paine every day or two as he walked up and down the street, as he was about his yard, and as he sat on his porch, and saw him during the strike period. There was no change in his demeanor, actions, conduct, or manner of walking. McFarland visited Paine at the city jail the day after the killing, and later had a ten- or fifteen-minute conversation with him at the county jail. Over objection, McFarland expressed the opinion that Paine was sane when the killing occurred. Aside from the matter of the trial judge's discretion to permit the witness to testify, and allow opportunity for and extent of his observation to be considered by the jury in weighing his testimony, the witness was abundantly qualified to express an opinion regarding sanity.

It was not necessary, in order that the witness might express an opinion regarding sanity, that he first give the data for his opinion.

"This court has never decided that a lay witness who has had opportunity to observe the conduct of a person whose sanity is called in question may not give an opinion upon the matter without first stating in detail the facts that have been observed, although this has sometimes been assumed in a general statement of the rule. [Cases reviewed.]

"In *Commercial Travelers v. Barnes,* 75 Kan. 720, the rule was thus stated:

" 'Nonexpert witnesses shown to have had especial opportunities of observation are allowed to give opinion evidence of the mental condition of one under investigation in this respect, having first stated the facts upon which such opinions are based, or without stating such facts when opportunity is given to cross-examine in reference thereto.' (Syllabus.)

"This in accordance with the weight of authority and the better reason. (See 3 Wig. Ev. §§ 1933, 1935, 1938, 1922.)" (*State v. Rumble,* 81 Kan. 16, 19, 20, 105 Pac. 1.)

In the opinion in the case of *Stafford v. Sutcliffe,* 103 Kan. 592, 175 Pac. 981, the text of 3 Wigmore on Evidence, § 1935, is quoted. The author there said the rule of a few courts that testimony of observed data must precede the expression of opinion, is unsound, and that in

a few states the requirement has been expressly negatived. The decision in the case of *State v. Rumble* is cited in support of the latter statement, a fact not noted by the writer of the opinion in the Stafford case. While the opinion in the Stafford case is not very clear, the syllabus is in accord with the decision in the Rumble case.

The basis of McFarland's opinion was in effect mere negation of abnormal or peculiar conduct. The basis was adequate. Normal conduct displays no external indicia of aberration, and is consistent with normal mental condition; and it was for the defendant to cross-examine concerning glassy eye, distorted countenance, shambling gait, wild walk, or manifestations of somber kind. This is true in jurisdictions which require statement of observed data as a basis for an opinion that the subject of observation was insane.

"A nonexpert witness cannot give an opinion as to the sanity or insanity of the individual inquired of, based in whole or in part upon an abstract hypothetical question, but must base his opinion solely upon his own personal knowledge, observation, acquaintance, experience, etc., with the individual inquired of. [Citing cases.]

"Nonexpert witnesses, to give an opinion as to sanity of a party, must first state the facts claimed to show or indicate an abnormal condition of the mind; but such witness may give an opinion that the person inquired of was sane, by first merely denying generally the existence of any facts showing an abnormal or unnatural state of mind, and without specifying any of such facts. [Citing cases.]" (*Parrish v. The State,* 139 Ala. 16, 42.)

"There seems to be no controversy about the general rule that one who shows an acquaintance with the person whose mental capacity is in question and is familiar with his general conduct may testify affirmatively that in his opinion such person was of sound mind, while the opinion that such person was of unsound mind must be based on facts consisting of particular acts or conduct indicating unsoundness." (*Hull v. Hull,* 117 Ia. 738, 745.)

"Ordinarily, a lay witness is required, when giving an opinion that such a person is of unsound mind, to give the facts on which he founds that opinion. Not so, however, when he gives expression to an opinion that such person is sane, for in that case the subject of the testimony would not give manifestations of certain eccentricities which usually mark the conduct of mind diseased." (*State v. Soper,* 148 Mo. 217, 235.)

Helen McCallum lived next door to Paine's house. She had known Paine about thirteen years. She testified as follows:

"I remember the occasion of the shooting of Jack Heath, and saw Mr. Paine that evening around 6 o'clock. He was sitting on the front porch of his house, just sitting there talking with his wife. I spoke to him as usual, saying 'Good evening,' and he spoke, and I did not notice anything different in his manner and demeanor that evening from other evenings. I saw him again

after he shot the man, he was walking across the street from his house in his usual manner of stride like. He started across the street with a revolver behind his back, and walked up to the man on the front porch, spoke to him (I did not hear the words—said something), and began shooting the man as he was sitting in his front porch swing. Then he walked up the street, and that was the last I saw of him. He walked just like he walked across the street, his natural stride."

The witness was then asked if she had observed Paine's conduct and demeanor during the time she had known him. She answered she had not. She was then asked if she had noticed how he had acted before, and she said she had never observed anything peculiar about him. The court struck out the answer, and required her to answer yes or no. She said no. When asked if she had seen him prior to the date of the killing, she answered "numerous times." When asked if she noticed his actions and demeanor that evening, she said no. When asked if she noticed what he was doing that evening, she said she did. On the basis of this testimony, the court declined to permit her to express an opinion respecting Paine's sanity. She then testified she was familiar in a general way with the conduct of sane people, and she had seen somebody who was insane. She was then asked whether, from her knowledge of Paine before August 24, 1922, and keeping in mind what she knew about the actions of the sane and the insane, she had an opinion whether Paine was sane or insane when he shot Heath. She said she had an opinion, and over objection, she said Paine was sane.

As indicated, Miss McCallum had known Paine thirteen years, lived next door to him, and observed him numerous times. She observed and described in detail his conduct the evening of the killing. She described part of his conduct by reference to a background of familiarity. They greeted each other "as usual," she observed nothing differing from his answer and demeanor "other evenings," and he went across the street in his "usual" and "natural" gait. In view of this testimony, the court might well have permitted her to give opinion evidence. Subsequent examination disclosed nothing which added to her qualification. Observation of sane people generally was beside the point. Seeing some person afflicted with some type of mental derangement enabled her to do no more than compare the conduct of two individuals. It is not likely the witness intended to deny flatly that she had noticed Paine's action and demeanor the evening of the killing, which she fully described, and

doubtless whatever it was that led her to make verbal denial, led to verbal denial that she had observed his action and demeanor during the time she had known him. For the purpose of the decision, let it be conceded the witness should not have been permitted to express her opinion that Paine was sane. The worst that could be said of the testimony is that it was of little or no value. Being of little or no value, this court cannot declare that the jury must have regarded it as important. The instructions to the jury are not brought up for review. Presumably the court properly instructed the jury how it should deal with nonexpert opinions, and the result is, prejudicial error is not disclosed.

Defendant offered in evidence the reports of the institution commissions. Perhaps he intended to offer also the report of the court's commission, but the abstract does not show that he did so. The report is printed in the abstract, and may be considered as offered. The offer was rejected, and defendant assigns the ruling as error. Authorities are cited to the effect that an inquisition in lunacy is admissible in any kind of litigation to prove mental condition at the time of the inquisition. The court does not reach consideration of these authorities.

The issue was whether defendant was sane or insane on August 24, 1922, when the homicide was committed. The testimony of two members of the commission which examined defendant in December, 1922, and the testimony of the diagnostician who made the Wassermann test of defendant for the commission, covered in detail the proceedings of the commission. The members of the commission were unanimous in the opinion that defendant was insane in December. The state admitted they all signed a report to that effect, and there was no dispute about the fact. The parties stipulated concerning the three examinations and the results, and the stipulation was read in evidence. The report of the first institution commission is not abstracted, and this court has no knowledge of its contents beyond what the stipulation shows. The report of the second institution commission and the final certificates concerning recovery are abstracted, and they show nothing of any importance except recovery of mental health. The result is, it is of no consequence that the various documents were not admitted in evidence.

In arguing the case to the jury, the county attorney twice referred to the Hickman, Remus, and Leopold-Loeb cases. He said

this one was just another Hickman case, in which the defendant had committed a dastardly murder and then tried to hide behind a plea of insanity, and said the jury should not countenance such practice in Wyandotte county. On objection by counsel for defendant, the court said the remarks were not objectionable and did not constitute misconduct of counsel. The court, however, admonished the jury that the statements were not evidence, that they were merely argumentative, that they should have no weight as evidence, and that they should be considered merely as argument of counsel, in so far as they were applicable to the case, if at all. Whether the defense of insanity was meritorious depended on the evidence. Presumably, the instructions which the court had already read to the jury fully covered the defense. It is possible that without admonition from the court the argument of the county attorney might have had some tendency to divert the minds of the jury from the merits of the defense. The instruction given distinguishing between evidence and argumentative characterization was sufficient to confine the jury's consideration of the case to the evidence, and this court cannot declare that the instruction was not heeded.

An assignment that the court erred in approving the verdict is without merit.

The judgment of the district court is affirmed.