No. 29,591.

EDWARD W. MINGLE et al., *Appellants*, v. MATTIE ELLEN HUBBARD et al., *Appellees*.

(293 Pac. 513.)

Opinion filed December 6, 1930.

*F. Dumont Smith, Eustace Smith* and *Arthur T. Symns,* all of Hutchinson, for the appellants.

*R. C. Russell,* of Great Bend, and *A. L. Moffat,* of Kinsley, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action by relatives of the late Jacob Mingle, of Edwards county, to set aside his will on the alleged grounds that he was incompetent to make it and that it was effected through the undue influence of the defendant beneficiary.

Defendant denied the allegations of plaintiffs' petition and pleaded the probate of the will. In a cross petition she alleged that in 1911 Jacob Mingle made an oral contract with her by which he agreed that she should receive all his property at his death in consideration of her taking·care of him when he was sick and at such times as he needed her help until he died, and that pursuant to such contract she had rendered services to him to his entire satisfaction for the space of seventeen years until his death in 1928. She also alleged that Mingle caused the terms of that oral agreement to be reduced to writing and acknowledged its binding force before witnesses and by signing it with his mark, but that this writing had been lost or destroyed. The will of Mingle itself made reference to the agreement. In part it reads:

"1. To my niece, Mattie Ellen Hubbard, of Mulhall, Okla., I give, devise and bequeath all of my estate, both real, personal and mixed, she to take the same absolutely and in fee simple; but upon the condition, however, that she shall carry out fully the terms and conditions on her part of the agreement subsisting between her and me, whereby she is to care for me and my household in times of necessity until the time of my death. . . .

[Dated] "this 11th day of March, A.D. 1924.

"JACOB ✕ MINGLE, *Testator.*

"Witness to mark: SILAS McCARTHY, W. V. SMITH, HAROLD PAYNE."

On the issues joined the cause was tried by the court. Many witnesses testified *pro* and *con* touching the competency of Mingle to make a will at the time it was executed. One feature of the evidence stressed by plaintiffs was the fact that on February 14, 1924, only twenty-seven days prior to the making of the will, an inquiry

touching Mingle's soundness of mind was instituted in the probate court. Evidence on that matter was presented to a jury of six persons, who rendered a verdict that Jacob Mingle was feeble-minded and incapable of managing his affairs and that it was necessary that a guardian be appointed for his person and estate. Thereupon the probate court ordered that Mingle should be committed to the care and custody of his niece, Mrs. Mattie Hubbard, and that W. V. Smith, a neighbor of Mingle, should be appointed guardian of his person and estate. Mingle was not present when these proceedings transpired. He was ill at his home. The evidence tends to show that he soon improved in health, but made no objection to the probate court proceedings. He informed his guardian, W. V. Smith, of the contract he had made years before with defendant, and that a paper of some sort acknowledging that arrangement with defendant was in a bank in Lewis. That paper could not be found, and the discovery of its disappearance prompted the making of the will. The trial court made extended findings of fact on the issues raised by plaintiffs' petition, and also on those raised by defendant's cross petition, and therefrom deduced the following conclusions of law:

"CONCLUSIONS OF LAW..

. "The court concluded, as a matter of law, that the defendant, Mattie Ellen Hubbard, would be entitled to a decree of specific performance, decreeing that she is the owner of all of the real property in controversy.

"That the said Jacob Mingle, at the time he executed the will in question, was competent to make such will, and such will is valid."

The findings of fact which bear upon the competency of the testator to make a will at the time of its execution read:

"I. Jacob Mingle died in Edwards county, Kansas, on July 29, 1928, and on July 30, 1928, the last will and testament of Jacob Mingle, deceased, was duly admitted to probate . . .

"II. On the 14th day of February, 1924, at a hearing had in the probate court of Edwards county, Kansas, the said Jacob Mingle was adjudged to be feeble-minded and incapable of managing his affairs, and a guardian was appointed for the person and estate of the said Jacob Mingle.

"III. Jacob Mingle was unmarried, and for many years lived alone upon land which he owned in Edwards county; he was reputed to be a fortune teller, and to have the ability to locate lost articles, and many persons consulted him. It was his practice to make no fixed charge for such consultations, but left it to the person consulting him to pay whatever he desired. On one occasion he had a considerable number of checks which he had accumulated over a period of months, and which he had not cashed at the bank. He was

also very profane in his speech, and suffered from some impediment in his speech which made him somewhat difficult to understand, and at times his talk was disconnected.

"IV. Mattie Hubbard, a niece of the deceased Jacob Mingle, and the sole devisee under the will, first visited with her uncle in 1911, and at that time she cleaned his house and washed and mended his clothing. She returned for another visit in 1913 and performed the same services, and after that, and until February, 1924, she visited him at least once each year, performing similar services for him, and on several occasions when he became ill, he sent for her to come and take care of him, which she did. In February, 1924, Jacob Mingle having become sick and unable to care for himself, Mattie Hubbard and her husband moved onto the premises where Mingle resided, and continued to live there and care for him until the time of his death. . . .

"IX. Mingle told W. V. Smith, who was appointed as his guardian, that he had a paper in his box in the Home State Bank at Lewis which would give all of his property to Mrs. Hubbard, and upon learning that there was no such paper in his box at the bank, he asked to be taken to Kinsley, and was taken to the office of Harold Payne, a practicing lawyer, and at that time, probate judge, where he executed the will in question, on March 11, 1924. At this time Judge Payne was not able to understand Mingle's talk distinctly, but read over the will to him after it was prepared, and Mingle stated that it was satisfactory. Mingle at the time of his death was about 85 or 86 years of age, and immediately prior to the hearing in which he was adjudged feeble-minded had been sick and was physically unable to look after and transact his ordinary business affairs. . . .

"XI. That on March 11, 1924, being the date of the execution of the will in question, the said Jacob Mingle had full knowledge at the time of making the will of the act he was then engaged in, and of the property he possessed, and had an intelligent understanding of the disposition he desired to make of his property, and to whom he desired to give it, and had the capacity to recollect and comprehend the nature of the claims of those of his relatives who were excluded from participation in his bounty."

Judgment being entered for defendant, plaintiffs appeal, first propounding for our consideration this question:

"Was the will of Jacob Mingle probated by the probate court of Edwards county, dated March 11, 1924, a valid will, and was Jacob Mingle at the date of said will of sound and disposing mind, he having been duly adjudged incompetent and a guardian appointed for his person and estate by the probate court of Edwards county, Kansas, on the 15th day of February, 1924?

"If this question is answered in the affirmative and the court holds that a person of feeble mind, so adjudged, and for whom a guardian has been appointed, can make a will, that ends the case and the judgment should be affirmed."

There is no hard and fast rule of law that a feeble-minded person is incompetent to make a will, or that a man for whose person and property a guardian has been appointed by the probate court may

not do so. Even in a case of adjudicated insanity, where it was found that such mental disorder had existed for the previous thirty days, it was conceded by this court that such adjudication only made a *prima facie* case of testamentary incompetency against a will executed five days prior to the adjudication of insanity, and that the proponents of the will had the right and privilege to adduce evidence of sufficient potency to overcome that *prima facie* proof, if it were available. (*Fuller v. Williams,* 125 Kan. 154, 264 Pac. 77.)

In *State v. McMurry,* 61 Kan. 87, 58 Pac. 961, which was a criminal prosecution for arson, defendant offered in evidence the record of an inquisition in lunacy where he had been found to be a person of unsound mind and incapable of managing his affairs. This offer was erroneously rejected. Chief Justice Doster, speaking for the court, said:

"May the record of the proceedings in lunacy be received to prove the fact of insanity? We think it may. Ordinarily the judgment of a court is not receivable in a controversy to which a stranger to the judgment is a party, except merely to prove its existence and effect. (2 Whart. Ev. § 823.) An exception, however, is made in the case of judgments *in rem* declaring the status of persons or things. These are adjudications to which, in a sense, the whole world is a party. In some cases these judgments bind all persons conclusively. In others such persons are only bound to allow the presumption of the truth of their recitals. Of this latter class are inquisitions in lunacy. The rule is so stated by all the authorities." (p. 88.)

In *Deleglise v. Morrissey,* 142 Wis. 234, it was ruled that—

"An adjudication in guardianship proceedings that an aged woman was incompetent to manage her own affairs, though not *res adjudicata* in a proceeding for probate of her will, might properly be considered as persuasive in effect, the evidence being very much the same, and there being no claim that her mental condition had improved before the making of the will." (Syl. ¶ 1.)

In *Collins v. Long,* 95 Ore. 63, 8 A. L. R. 1370, it was held that the fact that the testator had been adjudged to be an incompetent person and that a guardian had been appointed for his person and estate did not destroy his right to make a will. In *Harrison v. Bishop,* 131 Ind. 161, 31 A. S. R. 422, in which the controlling question was virtually the same as the one at bar, it was held that while an adjudication of mental unsoundness of the testator and the appointment of a guardian for his person conclusively established the fact of his inability to manage his estate it did not necessarily establish the existence of such unsoundness as would incapacitate him from making a valid will. The headnotes of that case read:

"The adjudication of mental unsoundness in proceedings for the appointment of a guardian for a person, while it conclusively establishes the fact of his inability to manage his estate, does not necessarily establish the existence of such unsoundness as would incapacitate him from making a valid will.

"It is, however, *prima facie* evidence of such want of mental power, and when the validity of a will is properly in question, if it is shown to have been executed by one under guardianship, the burden is upon those who seek to uphold it to show by clear, explicit and satisfactory evidence that at the time it was executed the maker had the requisite degree of mental capacity."

In *In re Coleman's Will*, 88 N. J. Eq. 578, in a proceeding before a lunacy commission it had been adjudged that the testator was *non compos mentis* three weeks before his death and that he had been without lucid intervals for seventeen months prior thereto, during which period the will was executed. In an appeal from a decree of the ordinary admitting the will to probate, the court of errors and appeals affirmed the judgment, saying:

"The facts are fully set out in the opinion of the ordinary. The learned ordinary very properly held that the finding of the lunacy commission as to the mental state of the testator was not conclusive but only *prima facie* evidence of the facts found and may be overcome by satisfactory evidence of capacity at the time the will was made." (p. 579.)

To the same effect were *Brogan v. Lynch*, 204 Iowa 260; and *In re Cowdry's Will*, 77 Vt. 359.

In an annotation to *Collins v. Long*, supra, in 8 A. L. R. 1375 *et seq.*, the editor says:

"It is a practically universal rule that the mere fact that one is under guardianship does not deprive him of the power to make a will."

See, also, annotation in 7 A. L. R. 568; 2 Freeman on Judgments, 5th ed., 1898-1901; 28 R. C. L. 100, 101; 40 Cyc. 1018-1024.

Passing the legal question and turning to the evidence itself, appellants specify error in making finding of fact No. XI reproduced above. As we have seen, the lunacy proceedings and guardianship, at most, were no more than *prima facie* evidence of Mingle's want of testamentary capacity. To overcome that showing of incompetency defendant produced many witnesses, the substance of whose testimony was that Mingle was a queer old man who resided alone until defendant and her family came to live with him some four years before his death; that he was uncleanly, profane and somewhat addicted to intoxicating liquor; that he had been a good man to work until enfeebled by old age, after which he did not take good care of his cattle; that "he was a man of sound mind"; "he was

a man of average intelligence"; "he seemed to understand how to take care of his own business"; "he knew what property belonged to him and he knew how to transact the ordinary affairs of a farm." The probate judge who had adjudged Mingle an incompetent person and had appointed a guardian for his person and estate on February 14, 1914, also served as scrivener in the drawing of Mingle's will on March 11, 1924. He testified:

"Jacob Mingle was present when that will was drawn. He was not what I would call active and hardy, but he was able to be around; he walked into my office without any assistance; he was rather poor in flesh. . . .

"I heard the testimony at the guardianship inquiry in February.

"Q. From what you heard of the testimony, and his condition, and what you observed at that time he was in your office, have you an opinion as to whether his condition was about the same or had it improved or deteriorated? A. It had improved quite a little bit over what the witnesses showed it was at the hearing, on the question of his competency.

"His physical condition had improved. As I remember he was not able to attend the hearing; he was not there.

"Cross-examination:

"Q. From the conversation you had with him were you able to understand about what he wanted to do with the disposition of his property? A. Yes, I was able to understand. . . . I prepared the will according to the wishes of Mr. Mingle as I understood them. After I prepared the will I read it over to him.

"Q. Did he seem to understand it? A. He did. He approved of its terms as near as I could determine and signed it.

"Q. Were you satisfied at the time that he was competent to make that will? A. I was."

The probate judge was appellants' own witness, but their counsel say that the only evidence of value on the question of Mingle's testamentary competency was that of a Doctor Young, who had made a study of mental diseases. Apparently he knew nothing of Mingle at first hand. He testified:

"I have heard all the testimony and think I am competent to testify to the mental capacity of Jake Mingle. I think Jake Mingle was feeble-minded, lacking in development of brain; . . . The particular evidence which shows Mingle's feeble-mindedness is that he told everyone what he was going to do with his property. He suffered from delusions. The fact that he lived alone so long would be an added stress that would break down his mentality, similar to the sheep herder on the range. The spree drinker is the one who suffers the calamity of degeneration. Feeble-mindedness is not curable. It has no lucid intervals, is not progressive, but is the lack of intelligence. . . . In my opinion Mingle was not competent in March, 1924, to make a will. I don't think Mingle was capable of making a contract fair to himself after 1909 or 1910."

But it is settled law in this jurisdiction that nonexpert testimony is competent on the question of mental capacity, and it cannot be said the trial court was bound to adopt the views and conclusions of Doctor Young. (*Zirkel v. Leonard,* 61 Kan. 636, 60 Pac. 318; *Black v. Funk,* 93 Kan. 60, 143 Pac. 426; *Jenkins v. Jenkins,* 94 Kan. 263, 266, 146 Pac. 414; *Durant v. Whitcher,* 97 Kan. 603, 156 Pac. 739; *Stafford v. Sutcliffe,* 103 Kan. 592, 175 Pac. 981; *State v. Paine,* 126 Kan. 752, 755, 756, 271 Pac. 308.) The findings of fact of the trial court were supported by competent testimony, and as the charge of undue influence was abandoned the judgment will have to stand. It is therefore needless to consider that phase of the lawsuit based on the oral contract of 1911 between Mingle and defendant.

The judgment is affirmed.