No. 29,881.

CARL ELOF JOHNSON et al., *Appellees*, v. W. A. DONLEY, as an Individual and as Executor of the Last Will and Testament of John August Johnson, Deceased, *Appellant*.

(299 Pac. 270.)

Opinion filed May 9, 1931.

Z. C. *Millikin*, of Salina, for the appellant.

*Alex H. Miller*, of Salina, and *A. C. R. Swenson*, of Omaha, Neb., for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to set aside the purported last will and testament of the late John August Johnson, of Saline county, who died on January 27, 1928.

Johnson was of Swedish nativity, unmarried, and for many years he had earned his livelihood as a farm hand and worker at common labor. He had lost touch with his relatives, plaintiffs in this action. Johnson was thrifty; he had a small house in Bavaria, twelve acres of land near Hedville, and had about $9,000 in notes, bank stock and assets of similar character.

About January 1, 1928, when Johnson was about 74 years of age, he fell ill at his little home in Bavaria, Saline county, and the defendant W. A. Donley removed him to his residence, about a mile away. Two weeks later, at an evening card game at Donley's house, Johnson exhibited symptoms of mental unbalance. Several persons present noticed this condition and Donley remarked, "There is something seriously the matter with the old man's mind." Next morning about sunrise Donley called at a neighbor's house saying that Johnson had been very sick and out of his head all night. That neighbor, Swenson, and another, Lindell, called at Donley's that evening, January 14, to see Johnson, and tried to talk with him. Swenson testified that Johnson's talk "wasn't exactly natural." As Swenson and Lindell were leaving Donley followed them out on the porch and said, "What you fellows say about making a will?" Lindell answered:

"He is not in a condition to make a will to-night, and another thing, I wouldn't know what kind of a will to suggest to him to make because I don't want none of his property and I don't suppose you want more than is coming to you for taking care of him, and I suppose you will get well paid for that. . . . There is nothing to do now but let the law take its course. If they can find those relatives they will find them, otherwise it will go to the school fund."

During Johnson's last illness several persons called on him, including a preacher who tried unsuccessfully to persuade him to make a will and to leave bequests to certain benevolent institutions. Donley

testified that on the day the preacher called, January 14, Johnson asked Donley to make a list of his property, saying: "I was trying to figure up what I had and he (the preacher) bothered me." Donley testified:

"He asked me if I would help him and I told him yes. . . . I asked my wife for a paper. She got a piece of paper. Johnson told me that Walfred owes me $1,700. He says you mark it down. I wrote it down, then he told me different ones, told me about my note."

One item in the list of Johnson's property was a note which he held against Donley for $675.

Dr. J. H. Winterbottom, Johnson's physician, characterized Johnson's maladies as organic heart trouble, diseased kidneys, badly swollen limbs, and difficulty in breathing. On January 22, while receiving a professional call from Doctor Winterbottom, Johnson said to Donley: "I want you to have that note." Doctor Winterbottom suggested that there should be some memorandum to that effect. The doctor testified:

"I said, 'I think we had better make a statement of that fact that Mr. Donley is to have that note,' and he said 'all right.' Then I said, 'Have you made your will?' And he said he hadn't. I think then I volunteered to make the will."

Donley had told Doctor Winterbottom in private conversation that Johnson had said that he wanted him (Donley) to have all his property. The doctor's testimony continued—

"Q. Didn't you at that time ask him 'Do you want Donley to have all of your property?' or words to that effect? A. I asked him when we started to make the will.

. . . . . . . . . . . . .

"I asked him what property he had and he gave me three or four items of property he had, he couldn't remember.

. . . . . . . . . . . . .

"Q. Then what happened? A. Why, then Mr. Donley told me he had a list of the items.

"Q. What did he do? A. He, Donley, produced the list.

"Q. Now you stated, I believe, that the first three or four items were given by Mr. Johnson? A. Yes, sir.

"Q. And the rest of them were taken down by you from the list furnished by Mr. Donley? A. Yes, sir. Can't recall whether Mr. Donley read the list to me or whether I copied them off of the list."

The list prepared by Donley and from which the items devised by the will which the testator could not remember were taken is as follows:

"STATEMENT JAN. 18/28.

| | | | |
|---|---:|---|---:|
| "Walfred | $1,700.00 | House | $300.00 |
| George H. | 250.00 | Deposit | 400.00 |
| John Wiston | 250.00 | Bank share | 400.00 |
| Donley | 675.00 | Headvil | 100.00 |
| Alquist | 1,000.00 | Mrs. Alquist | 25.00 |
| Carlson | 1,000.00 | Annar Alquist | 1,000.00 |
| H. Swenson | 1,000.00 | Place | 500.00 |
| G. Swenson | 500.00 | | |
| Engstrom | 500.00 | | $9,600.00" |

The doctor's testimony proceeds:

"After I finished writing the paper I read it to him and received his approval of it; then he signed it. . . . After he signed I asked the witnesses to sign. They signed in his presence and right before him."

The four witnesses to the will selected by Doctor Winterbottom were himself, a prospective son-in-law of Donley who has since married Donley's daughter, another daughter of Donley, and Donley's wife.

After this transaction was finished Johnson spoke to one of Donley's daughters, saying, "I want you to have a $100." The doctor testified, "Johnson . . . was shaking so and I hated to make out another will, so Donley said, 'We will tend to that.' I said, 'There is plenty of witnesses here. We will see that she gets her $100.' I asked the witnesses to sign the will. I don't believe Mr. Johnson said anything in regard to that."

The doctor testified that at the time the will was made he knew that—

"Johnson wasn't going to live very long. . . . I expected [he] might die at any time.

"Q. What would you say, Doctor, about the man's mental condition at that time . . . A. I think the man knew what he was doing. . . . He couldn't remember it all, of course. . . . I think he realized what he was doing. . . ."

*Cross-examination:*

"I don't remember when Donley made the statement that Johnson wanted to leave the property to him. Can't remember whether it was in my office or not. Statement was made sometime before the will was written. . . . When I offered to write the will Johnson gave me three or four items.

"Q. Now, Doctor, I would like to have your best recollection as to what Johnson said when he stopped giving you those items, if you have any recollection; what was said by him? A. I think he just stopped, and, hesitating, stopped saying anything. He seemed to be thinking."

Opinion evidence pro and con touching Johnson's mental capacity at and near the time the will was made was given by various witnesses whose opportunities to ascertain that fact were more or less limited. Ida Lowman, in whose home Johnson had boarded for six and a half years towards the end of his life, visited Johnson at Donley's residence the day the will was made. She testified:

"Didn't appear to know me; carried on but a few words conversation.

"Q. Do you have an opinion as to whether his mind was sound? A. I don't think it was at the time I saw him."

*Cross-examination:*

"Q. Now, when you were there the last time you say he didn't do any talking? A. No, he didn't do any talking, that is, in a conversational way. .

"Q. Apparently he was in a condition that he didn't want to do any visiting with anybody? A. Yes. . . .

"Q. But you inferred from the fact that he was there and didn't want to talk to you—well, you realized that he wasn't feeling well? A. Yes, I thought he was very near death.

"Q. Looked like a sick man? A. Yes.

"Q. And because he looked that way you concluded that his mind wasn't right, is that about right? A. I suppose so."

It would serve no purpose in this review to reproduce the evidence at greater length.

An advisory jury returned answers to twenty-one special questions which the trial court adopted as its findings of fact, some of which read:

"1. Was John A. Johnson at the time of the execution of the alleged will of sound mind and memory? A. No.

. . . . . . . . . . . . . .

"3. Did John A. Johnson at the time of the execution of the alleged will have sufficient mental capacity to understand and keep in mind the value and extent of his property? A. No.

"4. Did John A. Johnson at the time of the execution of the alleged will have sufficient mental capacity to understand and keep in mind who were the natural objects of his bounty and what disposition he wished to make of his property? A. No.

. . . . . . . . . . . . . .

"16. Did John August Johnson at the time he signed the will have sufficient mental capacity to know and understand that by this will he was giving his property to the defendant? A. No.

"17. Was it the wish and desire of John August Johnson that the defendant should have his property as described in the will? A. No."

The court supplemented these with seventeen additional findings of its own, one of which reads:

"At the time he signed the will Johnson was near the point of death and was so weak that he could not recollect more than three or four items of his property and it was necessary to refer to a memorandum in possession of Donley to determine what property he owned. Among the promissory notes owned by Johnson was Donley's note for $675. Just before signing the will Johnson said to Donley, 'I want you to have that note.' And immediately after the will was signed he turned to Donley's daughter and said, 'I want you to have one hundred dollars.' Johnson either failed to comprehend the nature of his act in signing the will, or was too weak mentally, when the will was signed, to keep in mind the parties to whom he wished his property to go."

A summary of all these findings was that at the time the will was executed Johnson did not have testamentary capacity to make it, that it was procured to be made through undue influence, and that Johnson had no independent advice in reference to it.

Judgment was accordingly entered setting aside the will and the probate thereof and decreeing that the plaintiffs were Johnson's heirs at law and owners of the property involved.

Donley as beneficiary and also as executor appeals.

The first point urged against the judgment is that the action was not begun within the time prescribed by the statute. Johnson died on January 27, 1928. By the terms of his will Donley was named as sole beneficiary and named as executor of the estate. The will was admitted to probate on February 1, 1928. This action to set aside the will and the probate thereof was begun on October 24, 1928. It was therefore begun within the one year's time allowed by the statute. (Laws 1925, ch. 160, § 1, R. S. Supp. 1930, 22-222; *Serrault v. Price,* 125 Kan. 548, 265 Pac. 63.) The only party made defendant in the action when it was instituted was W. A. Donley as sole beneficiary. But under the circumstances the making of Donley, as executor, a party to the action was not essential to its maintenance. (*Marr v. Barnes,* 126 Kan. 84, 267 Pac. 9.) Furthermore, the order of the trial court, of November 26, 1929, making Donley, as executor, a party to the action was one which the trial court had power and discretion to make. It did not change nor enlarge the issues in the slightest degree, as the original petition had pleaded all the facts, and the failure to include Donley's name as executor in the first instance was one of form only. The rule seems to be that where an action to contest a will is timely begun by service of summons upon one or more indispensable parties, the statute of limitations is thereby effectively tolled as to everybody concerned who may afterwards be made parties to the litigation, where the

cause of action remains unchanged. (*Maurer v. Miller,* 77 Kan. 92, 93 Pac. 596; *Weichold v. Day,* 118 Kan. 598, 236 Pac. 649; *Hoffman v. Steffey,* 10 Kan. App. 574, 61 Pac. 822; *Kopperl et al. v. Sterling,* [Tex. Civ. App.] 241 S. W. 553; *Jackson v. Jackson,* 84 W. Va. 100; 37 C. J. 1068; 40 Cyc. 1258; 28 R. C. L. 394.)

It is next contended that the findings of fact were not supported by the evidence. It may be fairly debatable whether undue influence was established and may be questionable whether the situation of the parties required an application of the rule relating to independent advice, but what was lacking to make out a case of want of testamentary capacity? The nonexpert opinion to which the trial court gave credence was that Johnson was too sick and too feeble in body and mind to make a will about the time it was made. Even the doctor who wrote the will would state the matter no more positively than that he *thought* "the man knew what he was doing." Johnson's memory completely failed after he had dictated three or four items— which were the same as the first three or four on the list prepared by Donley. Neither of those items included what would be most likely to stick to the memory of a man of sound and disposing memory—his little home and his real estate. The remaining eleven or twelve specific items which Johnson could not recall were copied from the list prepared by Donley or written down by the doctor from Donley's dictation—the doctor could not remember which. What was quite certain was that those items were not dictated by Johnson. Two significant facts supplementing the other evidence to show Johnson's want of testamentary capacity were these: Immediately before the will was prepared Johnson indicated that he wanted Donley to have the note for $675 which Johnson held against him; and immediately after the will was prepared, signed and witnessed, Johnson said he wanted Donley's daughter to have a hundred dollars. The triers of fact could not be blamed for drawing an inference from those statements that Johnson did not realize he was making a will disposing of all his property. What was much more likely, if he understood anything about it, was that he supposed the doctor was doing what he had suggested—making a memorandum of Johnson's statement that Donley should be given his note. Moreover, why should Johnson say he wanted Donley to have one note which was only for $675 if he thought he was bequeathing to him ten notes aggregating $6,900, his house and land, his bank stock,

and his money in the bank? Why should he say, "Give Jessie a hundred dollars," if he understood he was devising the whole of his property to Donley? Indeed, the doctor's testimony was a virtual confession that the will which he had drawn was not the way the testator wanted it, but that another will to conform to Johnson's desire was not written because the doctor "hated to make" it. So the volunteer scrivener being tired of his job promised Johnson that "we [the doctor and the witnesses of his choosing] will see that she gets her $100." Another significant incident to the making of this will lay in the fact that the four witnesses to the will were selected by the doctor. The testator had nothing to do with it, and the circumstances did not indicate that he knew or approved of the service they rendered in his behalf at the doctor's request. (40 Cyc. 1115, 1116; 28 R. C. L. 127.)

Without dwelling on the evidence at further length, this court feels constrained to hold that it and inferences fairly deducible therefrom were sufficient to support the trial court's finding that John August Johnson did not have sufficient mental capacity to make a will on January 22, 1928, and the purported will was therefore invalid for that reason. (*Snyder v. Rankin,* 120 Kan. 186, 243 Pac. 287; *Mingle v. Hubbard,* 131 Kan. 844, 851, 293 Pac. 513; *Diver v. Fourth National Bank,* 132 Kan. 36, 294 Pac. 924.) This conclusion renders it unnecessary to consider the other matters urged against the judgment.

The judgment is affirmed.